UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE PICAYUNE RANCHERIA OF CHUKCHANSI INDIANS,<br><br>Plaintiff,<br><br>v.<br><br>RABOBANK, a national banking association, REGGIE LEWIS, CARL BUSHMAN, and CHANCE ALBERTA,<br><br>Defendants. | **1:13-cv-00609 LJO-MJS**<br><br>**ORDER DENYING REQUEST FOR TEMPORARY RESTRAINING ORDER (DOC. 16)** |

## I. INTRODUCTION/BACKGROUND

This case is an offshoot of an ongoing dispute between two factions within the Picayune Rancheria of Chukchansi Indians (the "Tribe"), a federally recognized Indian Tribe. Doc. 1 ("Compl.") ¶ 1. Among other things, the Tribe, through the Chukchansi Economic Development Authority ("CEDA"), operates the Chukchansi Gold Resort and Casino, located in Coarsegold, California (the "Casino"). *Id*. ¶¶ 11, 23. To fund construction of the Casino, CEDA issued roughly $310 million in bonds. Hash Decl., Ex. F, Doc. 10-2 at 1-2. In 2012, CEDA restructured those debts by exchanging the original bonds for new ones issued under an Indenture Agreement between CEDA and Wells Fargo, National Association ("Wells Fargo"). *Id*. The Indenture Agreement required that CEDA deposit all revenues from the Casino's operation into deposit accounts at Rabobank, and also required that CEDA, Wells Fargo, and Rabobank execute a "Deposit Account Control Agreement" ("DACA"), which governs control of the Casino's accounts. West Decl., Ex. A, Doc. 18-1, at 6, 17-18, 29, § 4.25.

On March 21, 2013, one Tribal faction, led by Nancy Ayala and purporting to represent the Tribe ("Plaintiff" or the "Ayala Faction"), filed suit against Rabobank in a judicial entity purporting to be the Picayune Rancheria Tribal Court (the "Ayala Tribal Court"), alleging Rabobank breached its contract with the Tribe by failing to release to the Tribe funds maintained in the Tribe's bank accounts. *See*

1

Compl. at ¶2; Ex. M (Doc. 1-15). The Ayala Tribal Court issued a temporary restraining order followed by a preliminary injunction ordering the Bank to pay a portion of the funds in the disputed accounts to bondholders; directing the Bank to interplead the funds remaining in the Accounts with the Tribal Court; prohibiting withdrawal of funds from the accounts except by order of the court; and establishing a procedure for withdrawal of the funds to pay the legitimate operating expenses of the Casino. *Id*.

On May 25, 2013, Plaintiff filed a complaint in this Court for declaratory and injunctive relief against Rabobank and three members of the Tribe's Tribal Council, Chance Alberta, Carl Bushman, and Reggie Lewis (the "Lewis Faction"). Compl. In the Federal Action, Plaintiff seeks to have this Court recognize and enforce the orders issued by the Tribal Court. *Id*.

On May 7, 2013, the Lewis Faction moved to intervene. Doc. 8. That motion, which is opposed by the Ayala Faction, Doc. 13, is still pending.

On June 3, 2013, the Ayala Faction filed a request for a Temporary Restraining Order ("TRO") requesting that this Court direct Rabobank to make a loan payment to Wels Fargo on behalf of the Tribe pursuant to the DACA and to interplead any funds remaining in the Disputed Accounts until such time as the Court can determine the merits of this case. Doc. 16. Rabobank filed an opposition to the TRO request, Doc. 17, as did the Lewis Faction by way of a special appearance, Doc. 20. Having reviewed all the pleadings, the Court finds that the issues are well defined and that oral argument will not be of material assistance. Therefore, the Court hereby adjudicates this matter on the papers in accordance with Eastern District Local Rule 230(g).

## II. ANALYSIS

**A.    TRO Standard.**

Fed. R. Civ. P. 65(b)(1)(A) permits a temporary restraining order ("TRO") "only if … specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." As such, the Court may only grant such relief "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat'l Res. Def. Council, Inc*., 555 U.S. 7, 23 (2008). To prevail, the moving party must show:

2

(1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm absent preliminary injunctive relief; (3) that the balance of equities tips in the moving party's favor; and (4) that preliminary injunctive relief is in the public interest. *Id*. at 20. In considering the four factors, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 23. "[I]njunctive relief [i]s an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id*. at 22.

**B.     Likelihood of Success on the Merits.**

"As a general rule, federal courts must recognize and enforce tribal court judgments under principles of comity." *AT & T Corp. v. Coeur d'Alene Tribe*, 295 F.3d 899, 903 (9th Cir. 2002). Under certain circumstances, a federal court has discretion to recognize and enforce non-final orders, such as injunctions. *MacArthur v. San Juan Cnty*., 497 F.3d 1057, 1066 (10th Cir. 2007) ("[T]he decision whether to enforce non-final orders of a tribal court is left primarily to our discretion under the doctrine of comity."). However, federal courts should "neither recognize nor enforce tribal judgments if: (1) the tribal court did not have both personal and subject matter jurisdiction; or (2) the defendant was not afforded due process of law." *Wilson v. Marchington*, 127 F.3d 805, 810 (9th Cir. 1997). In addition, a federal court has discretion to decline to recognize and enforce a tribal judgment on equitable grounds, including in the following circumstances:

> (1) the judgment was obtained by fraud; (2) the judgment conflicts with another final judgment that is entitled to recognition; (3) the judgment is inconsistent with the parties' contractual choice of forum; or (4) recognition of the judgment, or the cause of action upon which it is based, is against the public policy of the United States or the forum state in which recognition of the judgment is sought.

*Id*.

Here, this Court finds that it is more likely than not that: (1) the Ayala Tribal Court lacked subject matter jurisdiction over the underlying dispute with Rabobank; and (2) relatedly, enforcement of

3

the order would be inconsistent with the Parties' contractual choice of forum.[1] The Court also finds that Plaintiff has not established irreparable harm in the absence of injunctive relief.

### 1.   The Ayala Tribal Court Probably Lacks Subject Matter Jurisdiction Over the Underlying Dispute with Rabobank.

In March 2012, before the Tribal schism, the Tribe passed a resolution approving a "Tribal Court Ordinance." *See* Declaration of Michael Wynn in Support of Motion for Temporary Restraining Order, Ex. 1, Doc. 16-11 (Resolution 2012-45) at 1. The Ordinance, among other things, established a tribal court and delineated its jurisdiction. *Id.* § 2 (establishing the tribal court), §§ 4, 5 (specifying court's territorial and subject matter jurisdiction).

That same month, the Tribe passed an amendment to the Tribal Court Ordinance, which exempted certain transactions, and persons, from the tribal court's reach. The amendment provided that the Tribal Court Ordinance "shall not apply to any cause or right of action of any kind, or any claim, liability, damages, obligation or dispute of any nature arising in respect of or related in any matter to a Transaction, a Transaction Document, or to … a party or beneficiary of a Transaction Document." Wynn Decl., Ex. 3, Doc. 16-13 (Resolution 2012-53) at 2. The amendment defined "Transaction Documents" as those "effecting, implementing, evidencing, securing or otherwise related to any one or more Transactions." *Id.* "Transactions" are defined as "the issuance of New Notes" and "any transaction relating to the foregoing." *Id.* at 2-3.

The term "Transactions" clearly refers to the issuance of new notes as part of the restructuring described above. Execution of the DACA was a requirement of the Indenture Agreement that facilitated the restructuring, and therefore appears to qualify as a "Transaction Document," because it "effect[s] implement[s], evidenc[es], secur[es] or [is] otherwise related to any one or more Transactions." Accordingly, Resolution 2012-53 divests any tribal court organized under the Tribal Court Ordinance of jurisdiction over disputes "arising in respect of or related in any matter to" the DACA.

---

[1] Although there are arguably additional reasons why this Court is likely to decline to recognize and enforce the Ayala Tribal Court order, for the sake of expedience, only these two bases are addressed at this time.

It appears that the underlying Ayala Tribal Court lawsuit concerns DACA directly. The Ayala Tribal Court Complaint identifies all accounts governed by the DACA as the accounts in dispute, *compare* Doc. 1, Ex. N (Ayala Tribal Court Complaint) *with* Hash Decl., Doc. 10-1, Ex. E ("DACA") at Recital A (listing accounts subject to DACA), and seeks judicial remedies related to the monies held therein.[2]

The DACA, while generally concerning the rights of the "Secured Parties" (e.g., Wells Fargo) to control the listed accounts, also defines the "Depositor" to be CEDA. DACA at 1. At its heart, the Ayala Tribal Court lawsuit is a dispute over who can issue instructions in CEDA's name. *See generally* Doc. 1, Ex. N (Ayala Tribal Court Complaint). Therefore the Ayala Tribal Court lawsuit "aris[es] in respect of or related in any matter to" the DACA, and, thus, Resolution 2012-53 strips the Ayala Tribal Court of subject matter jurisdiction to hear the matter. A federal court should "neither recognize nor enforce tribal judgments if … the tribal court [lacks] subject matter jurisdiction…." *Marchington*, 127 F.3d at 810.[3]

### 2. Enforcement of the Ayala Tribal Court order is Probably Inconsistent with the Parties' Contractual Forum Selection Clause.

For the same reason, enforcement of the Ayala Tribal Court complaint appears to be inconsistent with the forum selection clauses contained in the DACA. Specifically, in the DACA, CEDA agreed "to irrevocably and unconditionally submit, for itself and its property, to the exclusive jurisdiction [of New York or California courts] … any action or proceeding arising out of or relating to [the DACA]." DACA § 10(a)(iii). CEDA also agreed "that it shall not institute any action in its own tribal court system in respect of any claim or cause of action arising out of or relating to [the DACA] …. or the transactions contemplated hereunder and thereunder, but shall instead resort to the [New York and California courts] set forth above."). DACA at § 10(a)(iv). The DACA further provides that "[t]o the extent that any

---

[2] Although the Ayala Tribal Court Complaint lists some additional accounts, the DACA applies to "renumbered or successor accounts," *see* DACA at 1, and Rabobank represents that the accounts listed in the DACA are the only ones containing substantial funds, *see* West Decl., Ex. I, Doc. 18-9 (Decl. of Darrel Hyatt) ¶ 3.

[3] Plaintiff's lengthy disquisition on the *Montana* doctrine and its exceptions, Doc. 16-1 at 13-22, is unpersuasive. *Montana v. United States*, 540 U.S. 544 (1980), and its progeny concern whether a tribal court <u>may</u> exercise jurisdiction over a non-tribal person or entity. Here, the Tribe has chosen <u>not</u> to exercise jurisdiction over certain subject matters. Montana is simply inapposite.

5

provision in this Agreement conflicts with any provision in any other agreement between Bank and Depositor, the provision in this Agreement shall control." DACA at § 11. CEDA's authority to enter into these forum selection clauses was approved by tribal resolution. Hash Decl., Doc. 10-2, Ex. H at 3 (acknowledging the DACA may contain the Tribe's "consent to have disputes resolved in non-tribal courts or by arbitration").

For the reasons set forth in the previous section, the Ayala Tribal Court lawsuit "aris[es] out of or rela[es] to" DACA. Therefore, this Court would be independently justified in declining to enforce the Ayala Tribal Court order because doing so would be inconsistent with the Parties[4] contractual forum selection clause. *See Marchington*, 127 F.3d at 810.

**C.    Irreparable Harm.**

Plaintiff has also failed to demonstrate irreparable harm sufficient to warrant injunctive relief. Plaintiff's assertion of harm is stated dramatically:

> What is at stake in this case is the present and future existence of the Tribe as a viable, functioning, political, and governing entity with reputable, profitable commercial enterprises.
>
> First, unless the Court issues a temporary restraining order, the Tribe will be unable to meet the operating expenses of its Casino and its Tribal government. Unless those expenses are paid, 1,200 employees of the Casino may be laid off and 35 employees in the Tribal government may lose their jobs. Without these employees, the Casino and the Tribal government will cease to operate and the ability of the Tribe to govern itself will be threatened. Markle Declaration, pp. 3-4, ¶ 10. Casey Declaration, p. 2, ¶¶ 5-6. Second, unless the Court issues a temporary restraining order, the Tribe will be unable to make its Loan payment on the Indenture. The failure to pay the loan will keep the Tribe in default under the terms of the Loan, which would subject the Tribe to a demand for immediate repayment of the entire Loan amount and possible seizure of the collateral that secures the Loan. In the event of seizure, the Casino will cease operating. Markle Declaration, pp. 3-4, ¶ 10.
>
> Third, and more generally, the damage to the Tribe that would result from the Bank's breach of its contractual obligations is incalculable. The Tribe could spend years attempting to get back the money drawn from tribal accounts by unauthorized persons, pay Tribal debts that are incurred as a result of either misappropriation of tribal funds or failure to meet tribal obligations based on the unavailability of those funds, and restore

---

[4] Although Plaintiff is purportedly the Tribe itself, CEDA is the Tribal signatory to the DACA. The Court will assume for purposes of this motion that Plaintiff is attempting to stand in CEDA's shoes, as CEDA is the only Tribal entity with any plausible claim to control the disputed accounts.

> the credit rating and business reputation of the Tribe, if the Bank is not prevented from refusing to recognize the Tribe's check signers and refusing to allow the Tribal Council to draw on the accounts maintained by the Tribe at the Bank.

Doc. 16-1 at 26-27.

Declarant Joyce Markle, the General Accounting Manager for the Casino, states:

> At present, the Casino does not have enough cash on hand to maintain the minimum amount of money that it is required to maintain in the Casino cage to pay jack pots, pursuant to federal regulations issued by the National Indian Gaming Commission, pay its employees and pay its vendors to continue to operate. The Casino has more than sufficient revenue, in the form of checks totaling over Seven Million Dollars ($7,000,000.00), to pay its operating expenses, but it cannot deposit or cash those checks because it does not have access to the Operating Account or any other bank account. If the Casino is not able to utilize the Casino's Operating Account, it will be unable to pay its employees, vendors and service providers. This will result in the employees, vendors and service providers refusing to supply goods and services essential to the operation of the Casino. That, in turn, will force the Tribe to cease or dramatically restrict the Casino operations.

Markle Decl., Doc. 16-7 ¶ 10.

However, there is nothing stopping the Casino from depositing the checks into the disputed Rabobank accounts.[5] Wells Fargo has the right under the DACA to direct that the loan payment be made and that other Casino expenses be paid. *See* DACA § 1(e). Because Plaintiff has failed to establish that the Tribe's debts and the Casino's expenses would not be paid under this provision, it has failed to establish the likelihood of any damage to the Tribe's reputation or credit rating caused by Defendants' conduct.

Plaintiff's complaint that it will be onerous and time-consuming to recover monies improperly withdrawn from the disputed account is insufficient to justify injunctive relief. Injunctive relief is only available when legal remedies are "inadequate." *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (the basis for injunctive relief is irreparable injury and the inadequacy of legal remedies). Thus, "[a] plaintiff is not entitled to an injunction if money damages would fairly compensate him for any wrong he may have suffered." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 595 (1952).

---

[5] In fact, the Lewis Faction's opposition indicates that the Ayala Faction has been deliberately refusing to deposit funds into the Rabobank accounts since as early as February 2013, a practice the Lewis Faction asserts violates Gaming Commission regulations and various contracts relating to the Casino's refinancing. Doc. 20 at 11.

"Typically, monetary harm does not constitute irreparable harm." *Cal Pharmacists Ass'n v. Maxwell–Jolly*, 563 F.3d 847, 851 (9th Cir. 2009) ("Economic damages are not traditionally considered irreparable because the injury can later be remedied by a damage award.").

### III. CONCLUSION

For the reasons set forth above, Plaintiff's request for a temporary restraining order is DENIED.

**SO ORDERED**
**Dated: June 4, 2013**

          **/s/ Lawrence J. O'Neill**
          **United States District Judge**